IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA

JANE DOE, a pseudonym,

     Plaintiff,

vs.

                                 CASE NO.:
                                 DIVISION:

NEW START CITY, INC., a Florida
Corporation d/b/a LAKE HOLDEN
INN,

     Defendant.

_____/

## **VERIFIED COMPLAINT**

Plaintiff, JANE DOE, by and through her undersigned counsel, brings this Complaint for damages against Defendant, NEW START CITY, INC., a Florida Corporation, doing business as LAKE HOLDEN INN, and now known as LAKE INN LLC, a Florida Limited Liability Company, and states as follows:

## **INTRODUCTION**

1. For decades, sex traffickers and their accomplices have brazenly operated in and out of hotels and motels. Criminals parade their misconduct openly on hotel and motel properties throughout the United States while the hospitality industry continues to allow them to use their properties, their rooms, and facilities for criminal activity, while they profit at the expense of human life, human rights, and human dignity.[1]

2. Florida is consistently ranked within the top three states nationwide for reported cases of sex trafficking.

---

[1] *Human Trafficking and Hotels & Motels*, THE POLARIS PROJECT (last viewed at 5/13/2023), https://polarisproject.org/human-trafficking-and-hotels-motels/.

3. Sex traffickers use threats, violence, manipulation, deception, debt bondage, controlled substances, and other forms of coercion to cause their victims to engage in commercial sex acts.

4. Hotels and motels are the chosen venue for sex traffickers to carry out the foregoing, as many offer a sanctuary for traffickers to operate in plain sight without penalty or action on the part of the establishment to curtail or hinder trafficking on their premise.

5. Further, hotels and motels allow sex traffickers to engage in their illegal activity more easily – this is due to anonymity, discretion, a greater sense of security for buyers, and ease of movement to a new location if law enforcement is alerted, amongst other reasons.

6. While the hospitality industry should be the first to report concerning events and observations, some hotels and motels prioritize profits over the safety and welfare of their patrons. NEW START is one such establishment.

7. This is an action against, *inter alia,* NEW START'S owners and/or operators who knew or should have known, based on a combination of well-documented indicators, that sex trafficking and other criminal activity was occurring, and would continue to occur, on their hotel premises as a result of their misfeasance and nonfeasance.

8. NEW START is a criminal entity masquerading as a motel.

9. At all material times, NEW START was owned, operated, managed, supervised, and in all ways, controlled by NEW START CITY, INC., which is the entity responsible for the hotel at which sex trafficking and drug sales openly took place.

10. NEW START'S owner/manager knew or should have known that sex trafficking repeatedly occurs under their flag and at their property. Rather than taking timely and effective measures to thwart this epidemic, NEW START has instead chosen to engage in,

2

conspire, and profit from the open and obvious presence of sex trafficking and drug sales on their properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

11.  NEW START has a fence surrounding the perimeter of the property and one point of entry and exit to that fenced in area that is closed off by a gate.

12.  NEW START employs a security guard who controls who is allowed to enter by confirming which trafficker or drug dealer the potential customer is seeking to visit, what their illegal purpose is on the property, or they must be "vouched for" by someone already known to the security guard.

13.  NEW START allows drug dealers and sex traffickers to set up drug stores and brothels on their property.  These illegal "stores" flourish because of the verification of criminal intent by the security guard to enter the property.

14.  At all material times, NEW START has knowledge, or should have known, of the prevalence of sex trafficking at their establishment.

15.  Every, or almost every, patron at NEW START was a drug addict and was being trafficked by a sex trafficker.

16.  JANE DOE was a young female who, at all material times, was addicted to heroin and was being trafficked by a well-known trafficker ("Trafficker") at NEW START from 2012 – 2014.

17.  JANE DOE's trafficker forced and coerced JANE DOE to engage in commercial sex acts at NEW START.

18.  Sufficient warning signs were present to put NEW START on notice that JANE DOE was a victim of sex trafficking.

19.  Trafficker and the owner/manager of NEW START conspired to allow Trafficker to

3

continually run his criminal operation at NEW START without hinderance and for the mutual profit of Trafficker and NEW START.

20. NEW START accepted payments for rooms used to advertise, harbor and provide JANE DOE for what they knew or should have known were forced and coerced commercial sex acts.

21. While NEW START collected rental fees, and benefited from increased occupancy rates, Plaintiff JANE DOE was being exposed to continuous and repeated dangerous conditions at NEW START that resulted in her confinement, bodily injuries, emotional distress, mental harm and anguish.

22. NEW START'S owner/manager knew or should have known that sex trafficking repeatedly occurs at their property. Rather than taking timely and effective measures to thwart this epidemic, NEW START instead chosen to engage in and profit from the open and obvious presence of a sex trafficker utilizing their properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

23. At all material times, NEW START'S owners, employees, agents, operators, managers and/or contractors aided, concealed, confined, benefitted and profited from sex trafficking, drug sales, and other criminal activity that was occurring on its premise.

24. At all material times, NEW START's owners, employees, agents, operators, managers and/or contractors knew or should have known that a trafficker was recruiting, harboring, providing, and advertising JANE DOE, while buyers were obtaining, patronizing, and soliciting on their premises and yet instead of rectifying the foreseeable risks  continued to benefit from the sex trafficking of JANE DOE that was occurring and would continue to occur on their hotel premises.

25. At all material times, NEW START was engaged in the act of renting rooms and

4

providing access to their property, causing the harboring of JANE DOE by means they knew or should have known involved force and coercion for the purpose of commercial sexual acts.

26. The Plaintiff brings this action for damages pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. § 1595, against NEW START, who knowingly benefited from a venture that they knew, or should have known, to be engaging in human trafficking in violation of 18 U.S.C. §§ 1591(a) and 1593A, and who enabled, harbored, facilitated or financially benefited, or any combination of the foregoing, from a sex trafficking venture in which Plaintiff was trafficked for sex, sexually exploited, and victimized in violation of the TVRPA.

27. This action is also for:

      a.  civil remedies for criminal practices,

      b.  negligent hiring, supervision, and retention, and

      c.  premise liability.

## PARTIES, JURISDICTION, AND VENUE

28. At all material times to this complaint, Plaintiff, JANE DOE, is an adult, is a U.S. citizen, is a resident of the State of Florida, and is *sui juris*.

29. Plaintiff was a human trafficking victim and therefore seeks to file this action pseudonymously, using her initials instead of her actual name.

30. Plaintiff is using a pseudonym because of the highly personal nature of her victimization and because of the serious risk of harm to which she would be exposed by her former traffickers if she brought this suit in her actual name.

31. Plaintiff's right to privacy and security outweigh the public interest in knowing her identification. Plaintiff's legitimate concerns also outweigh any prejudice potentially caused

to Defendant by allowing Plaintiff to proceed pseudonymously.

32. At all material times to this complaint, NEW START CITY, INC. was a Florida Corporation, doing business as NEW START, and its principal place of business was 4201 S. Orange Blossom Trail, Orlando, FL 32839.

33. Upon information and belief, at all material times, NEW START was licensed as a public lodging establishment in the State of Florida and was doing business as the same.

34. This Court has jurisdiction in that Plaintiff seeks monetary damages far exceeding the jurisdictional minimum of this Court of $50,000.00, exclusive of interest, costs, and attorney's fees.

35. Venue properly lies in this judicial circuit in that the misconduct and other tortious acts that are the subject of this lawsuit were committed. As such, venue is proper in Orange County, Florida.

## FACTUAL ALLEGATIONS

### A. The Hospitality Industry's Participation in Sex Trafficking in Florida

36. The hospitality industry plays a crucial role in the sex trade.[2] The trope of the "no-tell motel" is certainly not a new one. Hotels and motels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels and motels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.[3]

---

[2] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017)
[3] According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur. *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

37.  Traffickers and buyers alike frequently use hotel rooms to exploit and traffic victims.[4]

38.  Sex traffickers, or "pimps," use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts.

39.  Traffickers use hotels for "out calls," where the trafficker would cause a victim to be transported to a buyer locations, or for "in calls," where the buyer obtains a victim who is being harbored in a hotel room.  Often, a victim will be confined to a hotel room while a constant cycle of buyers repeatedly enter in and out of the same room.[5]

40.  Traffickers use hotels as the hub of their operations. Inside of rooms and on hotel properties, victims are often threatened assaulted, and sexually battered thereby forcing victims to continuously perform for buyers who utilize the hotel to procure sex acts.

41.  The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[6]

42.  Due to the failure of the hospitality industry to address the issue, hotels are *the* venue of choice for sex trafficking.[7]  Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies, train staff on what to look for and how to respond, maintain a safe environment on the premise, and/or establish safe and secure reporting mechanisms for those at the point of sale.

---

[4] According to a survey conducted by Businesses Ending Sex Trafficking (BEST Alliance), 63% of human trafficking crimes investigated occurred at hotels or motels.  *Hotel Employee Training*, BUSINESSES ENDING SEX TRAFFICKING (BEST ALLIANCE), https://www.bestalliance.org/for-hospitality-industry.html (2020).

[5] *On-Ramps, Intersections, and Exit Routes*, THE POLARIS PROJECT, https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf.

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[7] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 13, 2023).

43.  Of particular interest to traffickers is when a hotel is willing to do more than just act negligently.  Traffickers seek hotels that are willing accomplices to their criminal enterprise, eliminating the trafficker's need to be stealthy and attempt to provide any façade.

**B.  Defendant's Duty of Care to Patrons**

44.  Defendant is a for-profit motel and/or public lodging establishment pursuant to Chapter 509 of the Florida Statutes, which imposes legal responsibilities upon hotels/motels, like those owned and operated by Defendant, to take action to protect people. In Florida, hotels are "innkeepers" and owe patrons a special duty of care.

45.  But aside from their special duty to patrons and guests on their property, such as Plaintiff, Defendant has one of the highest obligations to protect their guests from known or anticipated dangers, which includes human trafficking and other illegal activity.

46.  The relevant motel premises includes the common areas, walkways, stairwells, private rooms, designated parking area, and property or land immediately surrounding the motel and enclosed within the fenced area.

**C.  Defendant Choses to Accept Profits in Exchange for the Harboring of JANE DOE on their Premises for the Purpose of Forced Commercial Sex Acts**

47.  Multiple statutes and initiatives dating back to 1997, have informed, mandated, called for, and suggested hotels implement effective safeguards to identify and eliminate incentives to derive benefits from supporting acts that they know or should know violate human rights under Chapter 77 of the U.S. Code, including human trafficking that will foreseeably occur at or involve their premises and at times even their personnel.

48. As with banking regulations that are geared to dismantle and counter terrorism networks, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as

1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[8]  Despite the two campaigns releasing online resources and toolkits and making them publicly accessible to any entity concerned with human trafficking the hotel industry continued to look the other way while benefitting from what they knew or should have known were commercial sex acts of a minor or of an adult and induced by force, fraud, or coercion.

49. Congress was well aware that disrupting human trafficking operations required removing profit incentives of businesses that provide necessary elements and resources to accomplish the acts defined in both 18 U.S.C. §§ 1591(a) and 1593A namely: recruiting, enticing, harboring, providing, transporting, obtaining, advertising, maintaining, patronizing, and/or soliciting.

50. Despite ample education much of the private sector, particularly lodging, transportation, financial and technology sectors, have delayed implementing internal policies that would identify trafficking related benefits and remove them from their bottom line.[9]

51. In turn, over the last decade more victims, including JANE DOE, have been trafficked utilizing lodging facilities to recruit, entice, harbor, provide, obtain, advertise, maintain, patronize, and/or solicit at hotel and motel properties just like NEW START across the country.

52. The difference in this last decade is that in 2008 Congress added a civil remedy to the TVPRA and put businesses on notice that they could be liable to victims if they did not begin

---

[8] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[9] *Jane Doe 1 v. JP Morgan Chase Bank, N.A.*, 22-cv-10019 (JSR) (S.D.N.Y. 2022); *Jane Doe 1 v. Deutsche Bank*, 22-cv-10018 (JSR) (S.D.N.Y. 2022)

to police their human trafficking derived benefits on their own. Human trafficking was no longer a victimless crime and the hospitality industry once and for all will now answer for benefits derived while they knew or should have known a victim was being induced into commercial sex acts either as a minor or as an adult by the use of force, fraud, or coercion.

53. JANE DOE brings this civil action to remedy harm that was made possible by NEW START, a sophisticated organization that knowingly benefitted from payments for use of their facilities and resources to recruit, entice, harbor, provide, obtain, advertise, maintain, patronize, and/or solicit JANE DOE, while employees and agents of NEW START knew or should have known of the force, fraud, and/or coercion being used to induce JANE DOE into commercial sex acts.

54. The hospitality industry and DEFENDANTS have been cognizant of their role and responsibilities in the sex trafficking industry for years.

55. From check-in to check-out, there are numerous indicators that traffickers and their victims exhibit during their stay in a hotel. With proper training and the implementation of reasonable security measures, hospitality companies could prevent and curtail the benefits they derive from the use of their premises for recruiting, enticing, harboring, providing, transporting, obtaining, advertising, maintaining, patronizing, and/or soliciting by what they knew or should have known were commercial sex acts of a minor or of an adult and induced by force, fraud or coercion.

56. Based on this long history and a lack of action on the part of the hospitality industry, in 2019, the Florida legislature stepped in and codified mandatory human trafficking training for industries that may be susceptible to being used to support trafficking operations, including the hospitality industry. The legislature stated that traffickers and clients of human trafficking

10

networks often use hotels, motels, public lodging establishments, . . . to acquire facilities wherein men, women and children are coerced into performing sexual acts, which places the employees of these establishments in direct and frequent contact with victims of human trafficking."[10]

57.   While the Florida legislature has now mandated training, this does not negate the hospitality industry's ability and need to train their staff on the importance of not accepting or deriving any benefit from suspected human trafficking on their premises, which is also an obvious safety issue for their patrons.

58.   Although it is undoubtedly a company's responsibility to ensure it and its agents, contractors and employees are following the law, many hotels operators, like NEW START, choose to look the other way while deriving benefits from what they know or should know is human trafficking.

59.   Training to identify human trafficking has been available for decades. There is ample data, step-by-step solutions and well-researched manuals published by anti-trafficking groups available to Defendants and the hotel industry to assist hotel owners and staff in every position to identify the signs of commercial sex acts that are induced by force, fraud or coercion. Florida's 2019 training statute creates a legal obligation to ensure each lodging facilities serving Florida residents and visitors has taken all appropriate measures to address trafficking on their premises, and if not, to timely implement reasonable policies, training, education and security measures.

60.   There are many signs of commercial sex acts being induced by means of force, fraud

---

[10] Chapter 2019-152, COMMITTEE SUBSTITUTE FOR HOUSE BILL 851, Florida House, http://laws.flrules.org/2019/152.

and coercion, some signs are obvious, others require a properly trained staff. Some examples of such signs are:

     a.  an excess of sex paraphernalia (condoms, lubricant, lotion, restraints, etc.) in rooms,

     b.  excessive body fluids on linens,

     c.  excessive amounts of cash stored in the room,

     d.  illegal drugs and drug paraphernalia in the room,

     e.  the same person rents multiple rooms,

     f.  declining room service for several consecutive days,

     g.  a request for a room in a part of the hotel not visible to the front desk,

     h.  significant foot traffic in and out of room(s),

     i.  foot traffic at odd hours of the day,

     j.  men traveling with multiple women who appear unrelated,

     k.  multiple women or young people known to be staying in rooms for extended periods of time without leaving,

     l.  bruises or marks from physical injuries,

     m.  signs of fear and anxiety,

     n.  guests screaming for help in private rooms,

     o.  guests or visitors that appear to be under the influence of drugs or alcohol,

     p.  guests arriving and/or departing with little or no luggage,

     q.  person preventing another individual from speaking for themselves,

     r.  guests or visitors that avoid eye contact,

     s.  guests or visitors that are inappropriately dressed;

t.   guests or visitors that appear disoriented, disheveled, or unhealthy, or

u.   a person controlling another's identification documents;[11]

v.   person   controlling   meals,   movement,   means   of   transportation, communications, and/or funds.

61.   Consequently, hotels and motels can and should adopt policies and procedures to:

a.   train and educate their staff on the hotel industry's historical and current risks of benefiting financially or otherwise from acts that support many forms of human trafficking;

b.   prohibit employees, agents and contractors  from joining in ventures that recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and/or solicit when they know or should know those acts are for the purpose of commercial sex acts of a minor; or commercial sex acts of an adult induced by force, fraud or coercion; or peonage, slavery or labor of any person induced by force, fraud or coercion,

c.   place warnings up at their establishment and institute compliance and oversight of operations to ensure that no benefits are derived by the business or any of its employees or agents from ventures that they knew or should have known are violations of Chapter 77 of the U.S. Code;

d.   make relevant human trafficking resources and education available to all

---

[11] *Id.*, DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/blue-campaign/hospitalityindustry; *See also,* Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

patrons, investors, business partners, employees, contractors, and agents;

e.  ensure resources and educational materials are updated;

f.  deter trafficking with visible postings on websites and at locations prohibiting employees from accepting funds tied to suspected trafficking activity;

g.  create an internal protocol to guide employees, agents and/or contractors to request assistance and to reach out for help if requested to do so by a victim;

h.  develop relationships with local resource providers and request updated educational materials and information to provide to staff who are likely to encounter potential trafficking victims;

i.  make zero benefit human trafficking information available in common areas and/or guest rooms to assist victims of human trafficking to recognize that is not lawful for lodging establishment and companies to benefit from their trafficking;

j.  create employee reporting obligations and protocols to alert law enforcement when suspicious activity is detected or observed; and

k.  maintain a working relationship with law enforcement and local service providers for the benefit of the community, patrons and guests.

62.  When the hospitality industry fails to create policies to end the practice of profiting from trafficking they increase the likelihood that victims will be trafficked through use of their resources and properties.

63.  Choosing or pretending to ignore the signs of human trafficking while engaging in a business venture of operating a lodging facility, renting rooms results in benefits from the

14

recruiting, enticing, harboring, providing, transporting, obtaining, advertising, maintaining, patronizing, and/or soliciting victims of human trafficking.  In so doing, they are enabling atrocities against human life and human dignity to go unchecked and unreported and are complicit in allowing their establishment to host and facilitate sex trafficking.

### D. NEW START Created an Environment that Encouraged and Promoted Criminal Activity, to include Sex Trafficking

64.  Upon information and belief, at all relevant times to this complaint, NEW START employed three or fewer people to operate and manage the business.

65.  Since the passage of the 2019 mandatory training bill, NEW START, now doing business as Lake Inn LLC, has violated the mandatory training laws four (4) times between 1/1/2021 through 6/30/2022.

66.  Upon information and belief, at all times relevant to this complaint, NEW START did not train its staff on sex trafficking whatsoever.

67.  Upon information and belief, at all times relevant to this complaint, NEW START did not develop or implement any procedures, protocols, or standards to detect and/or deter sex trafficking on its premise.

68.  Indeed, NEW START did quite the opposite and engaged in the criminal venture with the sex traffickers, both encouraging and profiting from the criminal activity.

69.  One such trafficker that was able to operate with impunity at NEW START was JANE DOE's Trafficker.

70.  The motel is surrounded by a fence so that there is only one way in and one way out of the property.

71.  In order to control who is entering and exiting the property, NEW START has their security guard man the gate that allows people to enter or exit the property.

72.   When a potential guest comes to the gate, the security guard will allow entrance if:

    a.   The person is trustworthy so that law enforcement is not alerted.  This is established if the security guard knows the person or someone he knows vouches for the person seeking entrance.

    b.   The person seeking entrance has to pay the security guard a fee for coming into the property.

    c.   The person seeking entrance must state their purpose.

73.   If the person was permitted entrance, he or she would also have to "tip" the front desk for their time on the property.

74.   For the criminals, like Trafficker, that lived and operated their criminal venture out of NEW START, this financial requirement for the freedom to operate openly at NEW START was understood.

75.   At all times material to this complaint, upon information and belief, Trafficker knew the owner/manager of NEW START and had a working relationship with him, in which he would pay the owner/manager, and the owner would allow him to operate his sex trafficking and drug dealing venture in plain sight, would allow Trafficker to tell the security guard to admit his criminal clients to the property, would not call the police on Trafficker, and would employ "lookouts" who would warn Trafficker if law enforcement was about to raid the property so he could escape.

76.   When Trafficker would post his victims online and anticipated a lot of buyers were about to come to the property for commercial sex, he would go to the front desk, or send one of his girls to the front desk to pay the owner/manager in advance so as to be "respectful."

77.   One of employees was addicted to crack cocaine.  If that person was present, Trafficker

16

would also offer some crack cocaine to that employee as a payment as well.

78. If buyers of sex visited for a commercial sex encounter and had not paid the fee in advance, the owner/manager would come knock on the door and demand the payment. When collecting the fee, the owner/manager would ask "is that date with you" or "is that call with you?"

79. The terms "date" and "call" are common phrases in sex trafficking and prostitution to refer to the buyer of commercial sex.

80. The rooms did not have a room phone within them.  Among other things, this ensured that the victims would have no way to call out for help unless their trafficker allowed them access to a cell phone.

81. Such a setup made working out of NEW START desirable to a trafficker that wanted his victims to have no means of escape.

82. NEW START had one or two employees serve as "lookouts."

83. If the police came to the gate and sought entrance, the lookouts would contact Trafficker and other drug dealers / sex traffickers that lived at NEW START on their cell phones to give them a tip that law enforcement was about to raid the facility.

84. Trafficker and/or his victims were expected to tip the lookout each day, per "date."

85. In addition, Trafficker had a lot of drug sales in and out of NEW START, which meant his client count was high and he owed a tip for each client to the owner/manager and lookout. Because he paid NEW START so well, they rewarded him by giving him the only room with a camera of the parking lot so that he could see the police coming before they entered the hotel.

86. NEW START did not have housekeeping and the motel guests were expected to bring

their own sheets and clean their own bathroom.

87.  The owner/manager of NEW START periodically engaged in commercial sex acts with the various girls on property.  He would make the arrangements with their respective traffickers to negotiate payment.

88.  At all times The NEW START parking lot was constantly filled people and drug deals would happen in the open in the parking lot, behind the perimeter fence.

**E. The Sex Trafficking of JANE DOE at NEW START**

89.  At all relevant times to this complaint, JANE DOE was a victim of sex trafficking.

90.  Starting in 2012 and continuing through 2014, Trafficker sex trafficked JANE DOE

91.  Over the course of two years, Trafficker lived at NEW START and ran an illegal drug store and sex trafficking business out of NEW START.  JANE DOE lived at NEW START with Trafficker.

92.  When JANE DOE would enter the property, she was allowed in because each time either:

    a.  Trafficker paid her entrance fee and they were allowed in together;

    b.  When went in alone, would have to be vouched for by another person on the property as being one of Trafficker's girls, and had to pay the entrance fee, or

    c.  Once NEW START realized JANE DOE belonged to Trafficker and associated her with him, she was allowed to enter without being vouched for, so long as she paid the entrance fee.

93.  Trafficker required JANE DOE to "walk the trail"[12] which was the phrase used to mean that she was to dress scantily so that it was apparent she was for sale and walk up and

---

[12] "The Trail" is a local term used to refer to Orange Blossom Trail.

down on Orange Blossom Trail until a car stopped and paid her to engage in commercial sex acts.

94. JANE DOE would "walk the trail" directly in front of NEW START, dressed in her underwear, and would often bring dates back through the gate and to her room to engage in commercial sex acts.

95. Trafficker would force and coerce JANE DOE to post advertisements for sex online.

96. When potential dates would call her, Trafficker had instructed JANE DOE what she was to say to the potential dates and how much she was to charge.

97. When dates arrived at the front gate, the date was told to say he was there to visit with JANE DOE.

98. The security guard at the front gate knew that JANE DOE was Trafficker's "girl," that he "owned" her, and would allow the date into NEW START, knowing his purpose was to engage in commercial sex acts with JANE DOE.

99. Trafficker frequently referred to JANE DOE as his "bitch" and other derogatory names that are common in sex trafficking.  He called her this in front of the NEW START employees.

100. The traffic coming into and out of the motel was heavy. JANE DOE saw an average of ten (10) dates per day.

101. Each date was admitted to the property for a short visit with JANE DOE by the security guard and was watched and observed by the lookout(s).  Each of these staff members witnessed the frequency of the dates coming and leaving the property, as well as their purpose in being there.

102. For each date, JANE DOE would collect the money and at the conclusion of the date,

Trafficker would then take the money from JANE DOE.

103.JANE DOE was heavily addicted to heroin, which was used as a tool to control her. When JANE DOE was "paid," Trafficker usually kept the money and gave her heroin instead.

104.JANE DOE was expected to earn a set amount of money.  Trafficker knew that she would become "dope sick" if she did not get heroin and mandated that she earn enough money for him before he would give her the drug dose that would prevent her from becoming sick.

105.In 2014, JANE DOE overdosed in one the rooms at NEW START and using heroin provided to her as part of her trafficking experience.

106.JANE DOE was taken to the hospital where life-saving medical care was administered.

107.After her release from the hospital, NEW START allowed her back onto their property with Trafficker to continue the sex trafficking venture and activity.

108.Trafficker was also extremely violent to JANE DOE and his other victims on numerous occasions.

109.Trafficker became enraged with JANE DOE one day and ordered that JANE DOE and another victim be beaten in the NEW START parking lot.

110.JANE DOE was beaten her until she was bruised, bloody, and almost unconscious while Trafficker watched.

111.NEW START did not contact law enforcement or an ambulance and took their instructions from Trafficker as to how to handle this situation.

112.JANE DOE lived in constant fear that Trafficker would harm or kill her and obeyed

him to avoid being harmed.

113. Trafficker forced and coerced JANE DOE to engage in commercial sex acts as part of a continual and ongoing sex trafficking venture from 2012 through 2014.

114. As a direct and proximate result of Defendant's actions, JANE DOE was serious harmed including, without limitation, physical, psychological, financial, and reputational harm.

### F. Equitable Tolling of Claims

115. Trafficker's criminal sex trafficking of Plaintiff took place from 2012 - 2014.

116. JANE DOE was prevented from previously pursuing her claims.

117. Although JANE DOE ceased to be victimized by Trafficker, she was still a victim of sex trafficking at the hands of a subsequent trafficker.  Her victimization continued until she was finally able to escape years later.

118. Traffickers use force and coercion to maintain full and total control over their victims and do not allow their victims the luxury of independent thought, or anything less than total obedience and submission.  JANE DOE was no exception.

119. While JANE DOE was a victim of trafficking, reporting what occurred, speaking to a lawyer, or pursuing a lawsuit were not possible, as her trafficker would have threatened her life or physically harmed her for even considering such a thought.

120. Additionally, in 2014, Plaintiff had a brain scan that showed a large tumor in her brain.

121. Plaintiff began a rigorous treatment plan for the cancer.

122. For several years, Plaintiff was placed on disability and experienced a cognitive impairment from the tumor.

123. As of the filing of this lawsuit, the cognitive impairment has been eliminated and

Plaintiff sought to bring these claims as soon as reasonably possible after restoration to full cognitive functioning.

<u>**COUNT I**</u>
**BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591(A)(2) AND 1595**

124. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1-123, as if fully set forth in this Count.

125. Defendant knowingly used the instrumentalities and channels of interstate and foreign commerce to facilitate violations of 18 U.S.C. §§ 1591(a)(2) and 1595(a), occurring within the territorial jurisdiction of the United States.

126. Defendant's conduct was in or affected interstate and/or foreign commerce.

127. Plaintiff was engaging in commercial sex acts at NEW START through force, threats of force, and coercion.

128. Trafficker, Plaintiff's sex trafficker, threatened and physically beat Plaintiff in the public parking lot of Defendant's motel.

129. Plaintiff was visibly on drugs and the owner/manager of NEW START knew that Trafficker sold drugs and people, to include JANE DOE.

130. Both Defendant NEW START and Trafficker received something of value for engaging in sex acts.

131. Trafficker received financial compensation for JANE DOE's sex acts.

132. JANE DOE received drugs so that she did not become sick from withdrawal symptoms as compensation for engaging in sex acts.

133. Defendant knowingly benefited, or should have known that it was benefiting, from assisting, supporting, or facilitating a violation of 1591(a)(1).

22

134. Defendant knowingly benefited from such participation by receiving financial compensation and/or something of value for its participation in the venture.

135. Defendant's conduct has caused JANE DOE serious harm including, without limitation, physical, psychological, financial, and reputational harm.

## COUNT II
### FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES
### FLORIDA STATUTE § 772.104

136. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1-123, as if fully set forth in this Count.

137. Defendant NEW START and Trafficker, with criminal intent, conspired to, endeavored to, and/or received proceeds from the sex trafficking of JANE DOE, directly or indirectly, from a pattern of criminal activity.

138. Defendant NEW START and Trafficker, through a pattern of criminal sex trafficking and drug distribution activity, conspired to, endeavored to, or did actually acquire or maintain, directly or indirectly, control of the enterprise.

139. Defendant NEW START and Trafficker acted with the intent to establish and/or operate an enterprise.

140. Defendant NEW START and Trafficker are employed by and/or associated with, the sex trafficking enterprise to conduct or participate, directly or indirectly, in the enterprise through a pattern of criminal activity.

141. As a direct and proximate cause of the foregoing, Plaintiff was injured by Defendant's actions and has suffered psychological, emotional, and physical injuries, emotional distress, mental anguish, pain and suffering and the loss of enjoyment of life.

## COUNT III
### NEGLIGENCT HIRING, SUPERVISION, AND RETENTION

142. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1-123, as if fully set forth in this Count.

143. Defendant NEW START, through its respective owners, employees, agents, operators, managers and/or servants negligently authorized criminals to:

      a.  rent rooms for commercial sex,

      b.  rent rooms for drug sale and use,

      c.  screen those that seek entrance to the property to ensure criminal intent, and

      d.  provided lookout services to criminal sex traffickers and drug dealers to ensure they can escape if law enforcement raids the property.

144. These actions were done after employees were explicitly made aware that Trafficker was a sex trafficker and was trafficking JANE DOE.

145. This created a foreseeable risk that Plaintiff, JANE DOE would be sold, purchased, used, abused, drugged, beaten, and forced to engage in commercial sex acts.

146. NEW START employees, agents, operators, managers and/or servants, failed to either identify and/or report the sex trafficking and foreseeable harm to Plaintiff.

147. NEW START was in control of the hiring of agents, employees, and/or servants at NEW START and was responsible for performing background checks on these agents, employees and/or servants; instructing, training and supervising said agents, employees, and/or servants; and deciding whether to terminate said agents, employees and/or servants.

148. NEW START had a duty to make an appropriate investigation of their agents, employees, and/or servants.

149. NEW START was in control of the supervising of the agents, employees, and/or

servants at the hotels that they owned, operated, supervised, controlled and/or or were otherwise responsible, and was responsible for instructing, training and supervising said agents, employees, and/or servants.

150. NEW START knew or should have known that their agents, employees, and/or servants were allowing criminals to rent rooms for sex trafficking and drug dealing.

151. NEW START knew or should have known that their agents, employees, and/or servants were failing to either identify and/or report the sex trafficking and foreseeable harm of the Plaintiff and others.

152. NEW START knew or should have known that their agents, employees, and/or servants were failing to refuse continued lodging services to sex traffickers.

153. At all material times, NEW START was negligent in their hiring, employment, supervision and termination decisions regarding their agents, employees, and/or servants, and said negligent decisions caused the Plaintiff JANE DOE to be injured.

154. It was foreseeable that NEW START'S acts and omissions increased the risk that these illegal acts would regularly occur on the premises of NEW START and would cause harm to the Plaintiff JANE DOE

155. But for the negligence and omissions of NEW START, the ongoing and continual sex trafficking venture could have been prevented and/or stopped.

156. As a direct and proximate cause of the foregoing, Plaintiff was injured by Defendant's actions and has suffered psychological, emotional, and physical injuries, emotional distress, mental anguish, pain and suffering and the loss of enjoyment of life.

## COUNT IV
### PREMISE LIABILITY

157. Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1-123, as if fully set forth in this Count.

158. At all times material to this complaint, the Plaintiff JANE DOE, while an invitee or otherwise lawfully present upon the premises of NEW START, did sustain injuries as a result of NEW START's actions, their respective patrons and the criminal activity carried on at NEW START.

159. NEW START by and through its agents, employees and/or servants, owed a duty to maintain the premises of NEW START that it owned, operated, controlled, supervised and/or for which they were otherwise responsible, in a reasonably safe condition and free from conditions that would render it dangerous and unsafe for its guests, to include Plaintiff JANE DOE.

160. NEW START by and through its agents, employees and/or servants, owed a duty to exercise reasonable care to protect Plaintiff JANE DOE, by inspection or other affirmative acts, from the danger of any reasonably foreseeable harm occurring from the reasonably foreseeable use of the premises of NEW START that it owned, operated, controlled, supervised and/or for which they were otherwise responsible by sex traffickers, such as Trafficker.

161. NEW START by and through its agents, employees and/or servants owed a duty to exercise reasonable care to keep the hotel guests of NEW START, including Plaintiff JANE DOE, safe by implementing and enforcing security measures and proper protocols.

162. NEW START by and through its agents, employees and/or servants owed a duty to safeguard Plaintiff JANE DOE against criminal conduct that NEW START could reasonably

26

foresee happening at NEW START.

163. NEW START by and through its agents, employees and/or servants owed a duty to maintain NEW START in a hospitable, safe and reasonable manner, as well those areas beyond the hotel's property lines for which NEW START had possession, custody or control thereof.

164. NEW START had actual or constructive knowledge of prior similar sex trafficking and drug dealing incidents carried out at this property.

165. NEW START knew or should have known, in light of all the attendant circumstances stated herein, that the risk of such criminal conduct taking place at the NEW START would be unreasonably high without NEW START taking appropriate security precautions against such conduct as well as protocols for reporting and refusing such conduct.

166. NEW START had actual knowledge of the dangerous condition Plaintiff JANE DOE was at NEW START, or in the alternative, that the dangerous condition existed for a sufficient length of time that NEW START should have exercised ordinary care, should have known of the conditions, thereby had constructive knowledge of Plaintiff JANE DOE's peril; and/or that the condition occurred with regularity at NEW START and was therefore foreseeable; and/or NEW START should have known of the dangerous condition or peril by conducting proper and reasonable inspection of the hotel premises and/or guests' conduct.

167. Because sex trafficking and associated conduct was foreseeable, NEW START had a duty to take adequate measures at NEW START to protect their guests, including Plaintiff JANE DOE, from being victims of continued sex trafficking.

168. At all times material, NEW START, by and through their agents, servants, and/or employees, created and/or allowed the dangerous condition to exist at NEW START and/or

failed to keep the Plaintiff JANE DOE safe while she was on the premises of NEW START.

169. NEW START could have taken any number of corrective measures to make the dangerous conditions at NEW START ceased, including but not limited to:

    a.  not accepting payments for criminal activity,

    b.  not renting rooms to known criminals or for criminal activity,

    c.  not allowing buyers of sex or "dates" to enter the premise through the gate,

    d.  not allowing buyers of drugs to enter the premise through the gate,

    e.  not notifying the criminals when the police were inspecting or raiding the property,

    f.  providing training regarding human trafficking awareness to employees, to include for how to identify individuals who may be traffickers or their victims,

    g.  establishing, implementing and/or enforcing protocols on reporting suspected human trafficking and responding to situations involving human trafficking; and

    h.  establishing, implementing and/or enforcing protocols on how to handle general emergency situations or manage criminal risks.

170. In failing to take any measures to report and remove the dangerous condition from the premises, NEW START failed to take reasonable care to protect Plaintiff JANE DOE, their hotel guest.

171. By providing a gatekeeper, as well as lookouts, to ensure only those with criminal intent entered the property, NEW START encouraged the use of the hotel premises by drug addicts, drug dealers, pimps, and criminals to run their own criminal venture to enslave, sex

traffic, batter, falsely imprison, overdose, and/or gravely injure women, such as Plaintiff JANE DOE, who – because of their fear, mental state, financial restraints and addiction – were unable to rescue themselves.

172. NEW START, by and through its agents, employees and/or servants breached its respective duty owed to the Plaintiff JANE DOE, and was negligent by:

a. Creating a dangerous condition;

b. Failing to correct the aforementioned dangerous condition;

c. Failing to report and refuse renting to the traffickers;

d. Failing to properly and adequately maintain the premises in a reasonably safe condition;

e. Failing to monitor and prevent their staff and agents from conducting and engaging in illegal sex and drug trafficking;

f. Failing to have security measures to protect the Plaintiff;

g. Failing to provide training regarding human trafficking awareness to employees and staff,

h. Failing to provide training to employees on how to identify individuals who may be traffickers or their victims of trafficking;

i. Failing to establish, implement or enforce protocols on reporting suspected human trafficking and responding to situations involving human trafficking;

j. Failing to establish, implement or enforce protocols on how to handle general emergency situations or manage criminal risks; and

k. Failing to take affirmative steps to investigate suspicious conduct and forbid criminal conduct.

173. As a direct and proximate cause of the foregoing, Plaintiff was injured by Defendant's actions and has suffered psychological, emotional, and physical injuries, emotional distress, mental anguish, pain and suffering and the loss of enjoyment of life.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff JANE DOE demands judgment against Defendant and seeks relief as follows:

A. Award compensatory damages to Plaintiff for past and future damages for the described losses with respect to each count;

B. Award Plaintiff reasonable attorney's fees;

C. Award Plaintiff the costs and expenses of these proceedings; and

D. Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

1. The Plaintiff demands a trial by jury, of all so triable issues, pursuant to Fla. R. Civ. P. 1.430.

## CERTIFICATE RE: E-FILING AND E-SERVICE

**I HEREBY CERTIFY** that this Complaint was filed electronically in compliance with Florida Rules of Judicial Administration 2.515 and 2.516(e).

**I FURTHER CERTIFY** for purposes of service of any documents after initial process that for Attorney Lisa Haba of The Haba Law Firm, P.A., lisahaba@habalaw.com is the primary designated e-mail address and legalassistant@habalaw.com is the secondary designated e-mail address.

Date: <u>August 29, 2023</u>                                    Respectfully Submitted,

**Lisa D. Haba**
The Haba Law Firm, P.A.
FBN: 077535
1220 Commerce Park Dr., Ste. 207
Longwood, FL 32779
T: (844) 422-2529
E-mail: <u>lisahaba@habalaw.com</u>

*Attorney for Plaintiff, JANE DOE*

## PLAINTIFF VERIFICATION

**I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this complaint and that the punishment for knowingly making a false statement includes fines and/or imprisonment.**

Dated: August 28, 2023

ID nala 'ERTDH jJHJVgrHUBD1

JANE DOE

### STATE OF FLORIDA
### COUNTY OF SEMINOLE

Sworn to and subscribed before me, by means of online notarization, this 28th day of August, 2023, by Plaintiff, who has acknowledged before me that she is the Plaintiff in the above Verified Complaint and executed the same, and said person has produced identification: FL Driver's License.

Witness my hand and official seal this 28th day of August, 2023.

Notary Public State of Florida
Maria O Neill
My Commission GG 951620
Expires 02/04/2024

Notary Public/Deputy Clerk

_____

Printed Name

Commission Expires: _____

32